# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NUCOR STEEL-ARKANSAS & NUCOR-YAMATO STEEL COMPANY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 14-cv-0199 (KBJ) |
| SCOTT PRUITT, *in his official capacity as Administrator, U.S. Environmental Protection Agency*, | ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

This case is nominally a procedural action that Plaintiffs Nucor Steel-Arkansas and Nucor-Yamato Steel Company (collectively, "Nucor") have filed against the Administrator of the Environmental Protection Agency ("EPA") pursuant to one of the citizen-suit provisions of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401–7671q.  *See id*. § 7604(a)(2) (authorizing lawsuits against the Administrator of the EPA where the agency has allegedly failed to perform a non-discretionary duty).  But in the broader scheme of things, this matter is actually one of many battlegrounds in a multi-front conflict between two competing steel-manufacturing companies with facilities in Mississippi County, Arkansas.  Nucor operates two manufacturing facilities near Blytheville, Arkansas, which is approximately twenty miles from a site in Osceola, Arkansas, at which Big River Steel Company ("Big River Steel") has proposed to build a new manufacturing facility.  (*See* Nucor's Second Suppl. & Am. Compl. ("Compl."),

ECF No. 40, ¶¶ 4–5, 10.)[1]  Big River Steel obtained a permit from the Arkansas Department of Environmental Quality ("ADEQ") that authorized the construction and operation of its planned facility, and Nucor responded by launching legal attacks against the permit, both in the Arkansas state court system and in the U.S. District Court for the Eastern District of Arkansas.  *See Nucor Steel-Arkansas v. Ark. Pollution Control & Ecology Comm'n* (*Nucor I*), 478 S.W.3d 232 (Ark. 2015); *Nucor Steel-Arkansas v. Big River Steel, LLC* (*Nucor II*), 825 F.3d 444 (8th Cir. 2016).[2]

Significantly for present purposes, Nucor has also sought to challenge Big River Steel's permit by petitioning the EPA to object to the permit under Title V of the CAA, 42 U.S.C. §§ 7661–7661f.  Per Title V, the EPA may object to any operating permit that a state permitting authority issues if the permit does not comply with the CAA, *id.* § 7661d(b)(1), and if EPA fails to object on its own, any person may petition the agency to issue an objection, *id.* § 7661d(b)(2).  When the EPA failed to respond timely to Nucor's petition for an objection to Big River Steel's permit, Nucor filed this lawsuit, seeking a court order that compels the EPA to respond to Nucor's petition.  (*See* Compl., Prayer for Relief, ¶ B.)

Before this Court at present is the EPA's motion to dismiss Nucor's complaint. (*See* EPA's Mot. to Dismiss Second Suppl. & Am. Compl. for Lack of Jurisdiction ("Mot."), ECF No. 43.)  In the motion, the agency contests Nucor's various stated bases for Article III standing, only one of which this Court finds worthy of discussion here.[3]

---

[1] Big River Steel is participating in this lawsuit as an *amicus curiae*.  (*See* Order, ECF No. 34.)

[2] Both of these legal challenges were ultimately unsuccessful.  *See Nucor I*, 478 S.W.3d at 236–37; *Nucor II*, 825 F.3d at 446–47.

[3] In order to demonstrate that it has standing to sue, a plaintiff needs to identify only one type of cognizable injury-in-fact, and therefore, a court "need not address" alternative theories of injury once

Specifically, Nucor's complaint asserts that, by operation of a set of rules within the CAA known as the Prevention of Significant Deterioration ("PSD") program, the permitted emissions from the new Big River Steel mill will cause a construction project that Nucor has planned to undertake at one of its Arkansas facilities to be subject to more stringent emissions limitations than would have applied to Nucor's project otherwise. (*See* Compl. ¶¶ 63, 71–81.)  The EPA argues that Nucor has not adequately alleged that Big River Steel's permit will cause Nucor imminent injury in this way, because the complaint does not sufficiently assert that Nucor has any imminent construction plans that will require PSD-program review or that such plans would actually be affected by Big River Steel's emissions. (*See* Mot. at 18–23.)[4]

For the reasons explained below, this Court agrees with Nucor that certain allegations in the complaint are sufficient to demonstrate (for the purpose of the pleading stage of this litigation) that Big River Steel's permit works a plausible and imminent injury to Nucor in the form of more stringent limitations under the PSD program.  (*See, e.g.*, Compl. ¶ 78 (alleging that one of Nucor's facilities "is currently pursuing permit modifications that may require PSD review"); *id*. ¶ 28 (asserting that Big River Steel's emissions "will impact the overall air quality of Mississippi County, including the air quality in and around Nucor's facilities").)  Consequently, this Court finds that the complaint adequately alleges Nucor's standing to bring the instant lawsuit, which means that the EPA's motion to dismiss for lack of standing must be **DENIED**.  A separate order consistent with this Memorandum Opinion will follow.

---

one injury-in-fact is established.  *Sierra Club v. EPA*, 755 F.3d 968, 976 n.2 (D.C. Cir. 2014).

[4] Page-number citations to the documents the parties have filed refer to the page numbers that the Court's electronic filing system automatically adds.

I.     **BACKGROUND**

This Memorandum Opinion addresses the EPA's contention that Nucor lacks Article III standing because its complaint does not adequately allege that Nucor has imminent construction plans that the emissions from Big River Steel's new facility will affect by operation of the PSD program.  Notably, the EPA appears to accept Nucor's suggestion that an injury of the type Nucor alleges *can* constitute a concrete, particularized injury that would confer Article III standing *if* an entity that has imminent construction plans demonstrates that it actually would be harmed in this way. In order to evaluate the EPA's assertion that Nucor's complaint fails to make an adequate showing of imminent injury, it is important to understand how the operation of the PSD program could possibly inflict a cognizable injury-in-fact for standing purposes, and achieving that understanding requires background knowledge of the overall CAA scheme and the contours of the PSD program, both of which are sketched out below.

A.     **The Clean Air Act Framework**

With the CAA Amendments of 1970, Congress enacted a "comprehensive national program that made the States and the Federal Government partners in the struggle against air pollution."  *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990).  At the heart of the CAA are the National Ambient Air Quality Standards ("NAAQS"), which are specified numerical thresholds for the concentration of particular pollutants in the outdoor air (also known as the "ambient" air).  *See* 42 U.S.C. § 7409.  Because of their role within the overall statutory scheme, the NAAQS are generally considered to be "the engine that drives nearly all of Title I of the CAA." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

4

The CAA requires the EPA "to promulgate NAAQS for each air pollutant" about which the agency has made certain findings, *id.* at 462; *see also* 42 U.S.C. § 7409(a), and the agency must set these uniform, nationally applicable pollution standards at the levels necessary "to protect the public health," 42 U.S.C. § 7409(b)(1), while also providing for "an adequate margin of safety," *id.*, and "accurately reflect[ing] the latest scientific knowledge" about the effects on public health from the presence of each pollutant in the ambient air, *id.* § 7408(a)(2).  To date, the EPA has promulgated NAAQS for six types of air pollutants.  *Util. Air Regulatory Grp. v. EPA* (*UARG*), 134 S. Ct. 2427, 2435 (2014); *see* 40 C.F.R. pt. 50.  As pertinent here, there are two NAAQS that relate to a pollutant called "particulate matter": one that applies to $PM_{2.5}$ and another that applies to $PM_{10}$.  *See* 40 C.F.R. §§ 50.6 (setting NAAQS for $PM_{10}$), 50.13, 50.18 (setting NAAQS for $PM_{2.5}$).[5]

1.   The States' Role In The Regulation Of New And Modified Stationary Sources Under The CAA

Once the EPA establishes a NAAQS for a particular pollutant, each state assumes the lead role in implementing that air quality standard, with each state adopting (subject to EPA approval) "a plan which provides for implementation, maintenance, and enforcement" of that NAAQS.  42 U.S.C. § 7410(a)(1).[6]  Each state's implementation plan ("SIP") is subject to certain minimum requirements laid out in the CAA, *see id.* § 7410(a)(2), but "[i]t is to the States that the CAA assigns initial and primary responsibility for deciding what emissions reductions will be required from which

---

[5] These two NAAQS reflect different particle sizes.  $PM_{2.5}$ takes account of particles with a diameter of 2.5 micrometers or less, while $PM_{10}$ takes account of particles with a diameter of 10 micrometers or less.  *See* 40 C.F.R. §§ 50.6, 50.7, 50.13.

[6] The EPA has approved Arkansas's SIP.  *See* 40 C.F.R. §§ 52.170, 52.172.

sources" in order to achieve the NAAQS.  *Am. Trucking Ass'ns*, 531 U.S. at 470; *see also* 42 U.S.C. § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting [a SIP] which will specify the manner in which [the NAAQS] will be achieved and maintained within each air quality control region in such State.").

As a general matter, through its SIP, each state implements a permit program that requires each new and modified major stationary source of pollution to seek a pre-construction permit that sets emissions limitations for that source.  *See Texas v. EPA*, 726 F.3d 180, 183–84 (D.C. Cir. 2013); *see also* 42 U.S.C. §§ 7410(a)(2)(C).  For example, in Arkansas, the ADEQ issues pre-construction permits, *Nucor II*, 825 F.3d at 447; *see* Ark. Code §§ 8-4-201, 203, and any entity that plans to build a new major emitting facility, or modify an existing one, must apply to the ADEQ for a permit that, if granted, contains allowable emissions levels pertaining to that source, *Nucor II*, 825 F.3d at 447.

Importantly, the particular emissions limitations that apply to a new or modified source depend on where the source is located.  The EPA divides the country into "air quality control regions" and classifies each region as being in "attainment," or in "non-attainment," or treats the region as "unclassifiable," with respect to each NAAQS.  42 U.S.C. § 7407(d)(1)(B); *see* 40 C.F.R. pt. 81, subparts B–C.  And these designations dictate which emissions limitations the states must impose in any pre-construction permits that they issue in a particular region.  *See* 42 U.S.C. §§ 7475 (setting permit requirements for sources in "attainment" and "unclassifiable" regions), 7503 (setting permit requirements for sources in "non-attainment" regions).

In essence, "the [CAA] triggers more or less stringent [emissions] requirements depending on the quality of an area's ambient air." *Catawba Cty, N.C. v. EPA*, 571 F.3d 20, 26 (D.C. Cir. 2009).  Furthermore, the EPA can change a region's designation "at any time[,]" based on "any . . . air quality-related considerations the Administrator deems appropriate[.]"  42 U.S.C. § 7407(d)(3)(A).

> 2.    The PSD Program

In regions that have been designated "attainment" or "unclassifiable," the CAA requires states to implement the statute's Prevention of Significant Deterioration ("PSD") program.  *See id.* § 7471.  The PSD program is so named because, in attainment and unclassifiable regions, the pre-construction permits that states issue have to impose the emissions limitations that are "necessary . . . to prevent significant *deterioration* of air quality," 42 U.S.C. § 7471 (emphasis added); hence, the pre-construction permits that the states issue in those regions are known as "PSD permits," *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 470, 472 (2004).  When a major new or modified emitting facility seeks a PSD permit, it is required to certify that it will comply with a number of requirements.  *See* 42 U.S.C. § 7475.  One such requirement is that the new or modified facility must employ the best available control technology ("BACT") for each pollutant subject to the PSD program.  *Id.* § 7475(a)(4).  Another is that the facility must "demonstrate[]" that its emissions "will not cause, or contribute to, air pollution in excess of any . . . [NAAQS] in any air quality control region[.]"  *Id.* § 7475(a)(3).

In addition, and importantly for this case, the applicant must also "demonstrate[]" that its emissions "will not cause, or contribute to, air pollution in excess of any . . . maximum allowable increase or maximum allowable concentration

7

for any pollutant in any area [subject to the PSD program] more than one time per year[.]"  *Id.*  With respect to this last requirement, the "maximum allowable increase" for a particular pollutant is known as the PSD "increment."  *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 473; *see also* 42 U.S.C. § 7473 (setting "increments" for specific pollutants).

The PSD increment is a number that is expressed as an ambient concentration of a given pollutant in micrograms per meter cubed ($\mu g/m^3$), and it reflects "the maximum allowable increase in concentration[ of a pollutant] . . . over the baseline concentration."  42 U.S.C. § 7473(b)(2); *see also* 40 C.F.R. § 52.21(c) (setting PSD increments).  The EPA establishes the "baseline concentration" for a given pollutant, and the baseline, which varies from region to region, is generally equal to the concentration of the pollutant that was present in the ambient air at the time the first application for a PSD permit in a particular region was submitted.  *See* 42 U.S.C. § 7479(4); *see also* 40 C.F.R. § 52.21(b)(13)–(15).  The PSD increment—which, as explained, is the maximum allowable *increase* above the baseline—is a single number that the EPA fixes for each pollutant, and it applies to all regions that have been designated as "attainment" or "unclassifiable" with respect to that pollutant; for example, in the case of $PM_{2.5}$ and $PM_{10}$, the established PSD increments are 4 and 17 $\mu g/m^3$, respectively.  *See* 40 C.F.R. § 52.21(c).[7]  What this means, as a general and practical matter, is that all new or modified stationary sources of pollution in attainment

---

[7] These numbers reflect the "annual arithmetic mean" PSD increments—that is, the maximum allowable increase in the ambient concentration of each pollutant as measured over the course of a year.  *See* 40 C.F.R. § 52.21(c).  Moreover, these numbers apply in "Class II areas," *see id.*, which the law defines as all areas other than certain large national and international parks, *see* 42 U.S.C. § 7472.

and unclassifiable areas must be mindful not to construct facilities whose emissions of a pollutant would cause the region to exceed the PSD increment for that pollutant.

The method by which a new or modified facility must demonstrate that it will not "cause or contribute to" air pollution in excess of the PSD increment, 42 U.S.C. § 7475(a)(3), is critical to Nucor's PSD-related theory of injury in this case.  In brief, each PSD-permit applicant must begin by conducting an air quality impact analysis that identifies the area in which the proposed new or modified facility will have a significant impact on air quality.  *See* 42 U.S.C. § 7475(a)(6); 40 C.F.R. § 52.21(m); *see also* Environmental Protection Agency, New Source Review Workshop Manual C.26–31 (Draft, Oct. 1990) (hereinafter "NSRWM").  This "impact area" is "a circular area" that is centered on the proposed facility and has a radius that extends out either 50 kilometers or to the most distant point where air modeling suggests that a significant impact will occur, whichever is less.  *See* NSRWM at C.26.  Next, the PSD permit applicant must develop an inventory of "all increment-affecting sources located in the impact area" as well as "all increment-affecting sources located within 50 kilometers of the impact area . . . if they, either individually or collectively, affect the amount of PSD increment consumed."  *Id.* at C.35.  Sources are "increment-affecting" (and thus must be included in the inventory) if they have caused a change in emissions subsequent to the setting of the baseline concentration.  *See id.*

Finally, after assembling this inventory of nearby sources that already affect the PSD increment, the permit applicant must demonstrate that its proposed facility, in conjunction with the pre-existing facilities, will not cause the PSD increment to be exceeded.  *See* 40 C.F.R. § 52.21(k)(ii); *see also id.* § 52.21(b)(13)(ii)(a) (explaining

that emissions from other sources constructed after the baseline concentration has been set "affect the applicable maximum allowable increase[]" that a new facility must take into account when applying for a PSD permit).  Put another way, once the baseline concentration of a given pollutant has been set in a particular region, any facility constructed thereafter that increases the ambient concentration of that pollutant "consumes" a portion of the PSD increment, leaving less of the increment available for subsequent new facilities in the region to use.  NSRWM at C.10.

### B.    Underlying Facts And Procedural History

Big River Steel is currently constructing a steel mill near the town of Osceola in Mississippi County, Arkansas.  (Compl. ¶¶ 1, 9.)  Mississippi County is part of the Northeast Arkansas Intrastate Air Quality Control Region, *see* 40 C.F.R. § 81.139, which the EPA has classified as "attainment" or "unclassifiable" with respect to $PM_{2.5}$ and $PM_{10}$, *see id.* § 81.304, and thus the area is subject to the PSD program, *see* 42 U.S.C. § 7471.

In January of 2013, Big River Steel applied to ADEQ for a pre-construction PSD permit related its new mill, and it did so at the same time that it sought an operating permit under Title V of the CAA with respect to the proposed new facility.  *See Nucor I*, 478 S.W.3d at 237–38 & n.1.  The basic requirements for seeking and receiving a PSD permit are described above, *see supra*, Part I.A.2, while the purpose and procedures for operating permits under Title V—which is the vehicle pursuant to which the instant case is brought—are as follows.

### 1.    The Title V Permitting Process

Title V of the CAA mandates that each major stationary source obtain a facility-wide operating permit that lays out all federally enforceable emissions limitations

applicable to that facility.  *See Sierra Club v. EPA*, 551 F.3d 1019, 1022 (D.C. Cir.

2008); 42 U.S.C. §§ 7661–7661f.  Title V "is designed to facilitate compliance and

enforcement by consolidating into a single document all of a facility's obligations under

the Act."  *UARG*, 134 S. Ct. at 2436.  Title V operating permits are distinct from PSD

permits, *see id.* at 2435–36, but PSD-permit requirements are among the obligations

that must be included in a Title V permit, *see* 40 C.F.R. § 70.2 (defining "applicable

requirement" for the purposes of Title V to include "[a]ny term or condition of any

preconstruction permits" issued under the PSD program).  The EPA allows states to

consolidate their PSD and Title V permits, *see* EPA, Operating Permit Program, 57 Fed.

Reg. 32,250, 32,259 (July 21, 1992), and Arkansas has done so, *see Nucor II*, 825 F.3d

at 453; *Nucor I*, 478 S.W.3d at 238 n.1.  Moreover, having a Title V permit shields a

facility from the charge of operating in violation of the CAA, because once a facility

obtains a Title V permit, Title V's "permit shield" provision dictates that "compliance

with the permit shall be deemed compliance with" the statute.  42 U.S.C. § 7661c(f);

*see also Sierra Club*, 551 F.3d at 1022.

Significantly for present purposes, Title V establishes that a state permitting

authority must subject each Title V permit application to public comment and judicial

review by the state's courts, 42 U.S.C. § 7661a(b)(6), and it must also transmit all

proposed Title V permits to the EPA for review, *id.* § 7661d(a)(1).  If, upon review of a

Title V application, the EPA determines that the proposed Title V permit would violate

the CAA in any respect, it "shall . . . object to its issuance" and "provide a statement of

reasons for the objection" to the state permitting authority and to the permit applicant.

*Id.* § 7661d(b)(1).  If the state permitting authority receives an EPA objection, it may

respond by submitting a revised permit to the EPA, but it must refrain from issuing the permit. 42 U.S.C. § 7661d(b)(3). And once it has objected, the EPA makes the final decision whether to deny the permit or issue it with revisions, *id.* § 7661d(c); consequently, an objection from the EPA is effectively a "veto[.]" Operating Permit Program, 57 Fed. Reg. at 32,256.

However, if the EPA does not object within forty-five days of receiving a proposed Title V permit, "any person" may petition the EPA to object on any ground that was raised during the state permitting authority's public comment period. 42 U.S.C. § 7661d(b)(2). The EPA must grant or deny any such petition for an objection within sixty days of receiving it, and "shall issue an objection [i.e. grant the petition] within such period if the petitioner demonstrates . . . that the permit is not in compliance" with the CAA. *Id.*[8] The EPA's denial of a petition for an objection is subject to judicial review in the appropriate Court of Appeals. *Id.*; *see also id.* § 7607(b)(1).[9] In addition, if the EPA fails to take any action on the petition, the CAA's citizen-suit provision supplies a cause of action for the petitioner to bring a suit against the EPA in federal district court for "a failure . . . to perform any act or duty under [the CAA] which is not discretionary[.]" *Id.* § 7604(a)(2).

---

[8] The EPA maintains an online list of Title V petitions and its decisions on those petitions. *See* EPA, Title V Petition Database, www.epa.gov/title-v-operating-permits/title-v-petition-database (last visited Mar. 29, 2017).

[9] Because this pathway exists for judicial review of Title V permits, the CAA's citizen suit provision, 42 U.S.C. § 7604, does not encompass direct challenges to Title V permits in district court. *See Nucor II*, 825 F.3d at 452–53; *Romoland Sch. Dist. v. Inland Empire Energy Ctr. LLC*, 548 F.3d 738, 754–55 (9th Cir. 2008). Of course, judicial review from a state permitting authority's decision to grant a Title V permit is available in state court. 42 U.S.C. § 7661a(b)(6) (requiring state judicial review of Title V permitting decisions); *see, e.g.*, Ark. Code §§ 8-4-205, 223(a)(1), (d) (prescribing judicial review for ADEQ permitting decisions in the Arkansas Court of Appeals); *see also, e.g.*, *Nucor I*, 478 S.W.3d 232 (reviewing ADEQ Title V permitting decision).

2.    Big River Steel's Permit Application And Nucor's Response To It

Big River Steel's application to the ADEQ regarding the new steel mill that it proposed to build Osceola, Arkansas, contained an air quality analysis that predicted that the new mill would contribute 2.47 µg/m$^3$ to the ambient concentration of PM$_{2.5}$ in the region, bringing the total concentration to 11.91 µg/m$^3$, just below the NAAQS of 12 µg/m$^3$. *See Nucor I*, 478 S.W.3d at 237–38.[10]   ADEQ issued a draft permit in June 2013, which triggered a public comment period. *Id.* at 238.  Nucor had "actively followed" its prospective neighbor's permit application, and it "submitted over forty comments" to ADEQ, "most objecting to the technical aspects of [Big River Steel]'s modeling and to a perceived bias in ADEQ's evaluation of [Big River Steel]'s application." *Id.*  Over Nucor's vigorous objection, ADEQ issued a final permit on September 18, 2013. *Id.*

Nucor then proceeded to press its opposition to Big River Steel's Osceola mill on several fronts.  It appealed ADEQ's permit, first, to the Arkansas Pollution Control and Ecology Commission, which affirmed the permit, and then to the Arkansas Court of Appeals, which in turn affirmed the Commission. *Nucor I*, 478 S.W.3d at 236–37. Nucor also sued Big River Steel directly in the U.S. District Court for the Eastern District of Arkansas, challenging the permit under the portions of the CAA's citizen-suit provision allowing for claims against private parties. *See* 42 U.S.C. § 7604(a)(1), (3).  That court dismissed Nucor's complaint for lack of subject matter jurisdiction, *see Nucor Steel-Arkansas v. Big River Steel, LLC*, 93 F. Supp. 3d 983, 992–93 (E.D. Ark. 2015), and the Eighth Circuit affirmed, *see Nucor II*, 825 F.3d at 447.

---

[10] 12 µg/m$^3$ represents the primary annual arithmetic mean NAAQS for PM$_{2.5}$. *See* 40 C.F.R. § 50.18.

In addition, and directly relevant here, on October 9, 2013, Nucor petitioned the EPA to object to the permit under 42 U.S.C. § 7661d, raising many of the concerns that Nucor had previously flagged during ADEQ's public comment period.  (Compl. ¶¶ 95–96.)  Among other things, Nucor asserted that, when ADEQ issued the permit to Big River Steel, ADEQ failed to monitor the pre-existing concentration of $PM_{2.5}$ properly, failed to model the air quality impacts of the Big River Steel mill, and failed to establish an appropriate BACT standard.  (Compl. ¶ 57.)

3.   Procedural History

The EPA did not respond to Nucor's petition within the sixty-day statutory window.  (*See* Compl. ¶ 97 (citing 42 U.S.C. § 7661d(b)).)  After giving the agency the requisite notice of its intent to sue (*see* Compl. ¶ 92 (citing 42 U.S.C. § 7604(b)(2))), Nucor filed this lawsuit on February 11, 2014, alleging that the EPA's ongoing failure to respond to Nucor's petition constitutes "a failure of the Administrator to perform any act or duty . . . which is not discretionary[.]"  42 U.S.C. § 7604(a)(2).  Nucor's complaint seeks an order requiring the EPA to grant or deny its petition for an objection within 30 days.  (*See* Compl., Prayer For Relief, ¶ B.)

Since filing this lawsuit, Nucor has twice amended its complaint (once with the Court's leave and once under Court order) in response to motions to dismiss challenging its standing to sue, and both times, Nucor has expanded the complaint's allegations in support of standing.  (*See* Pl.'s Mot. for Leave to File First Suppl. & Am. Compl, ECF No. 19; Mot. for Leave to File Second Suppl. & Am. Compl., ECF No. 39.)

In its now-operative pleading, which is titled the Second Supplemental and Amended

Complaint, Nucor asserts several theories of injury.[11]

First, Nucor alleges that particulate matter emissions from the new Big River

Steel facility "will reach the Nucor mills given the short distance between them," and

"will negatively impact Nucor's employees' health and productivity, which impacts the

operations at Nucor's facilities." (Compl. ¶¶ 27, 29.) Second, Nucor alleges that

particulate matter emissions from the Big River Steel facility will damage Nucor's

property by polluting a 350-acre wildlife area that Nucor preserves for its employees'

leisure (*see id.* ¶¶ 36–52), and by "stain[ing] and damag[ing] buildings and other

property owned by Nucor" (*id.* ¶ 54). Third, Nucor alleges that it will suffer

competitive injury if ADEQ issues permits to Nucor in the future that, either initially or

as the result of an EPA objection, impose emissions limitations on Nucor that should

have been, but were not, imposed on Big River Steel. (*See id.* ¶¶ 57–62). Fourth,

Nucor alleges that Big River Steel's Title V permit contains unrealistic BACT

requirements, which will force Nucor to implement more expensive emissions control

technologies in the future when it submits its own permit applications. (*See id.* ¶¶ 82–

86.) Fifth, Nucor alleges that emissions from the Big River Steel facility will cause the

ambient concentration of $PM_{2.5}$ to exceed the NAAQS (*see id.* ¶ 63), which "will result

in Mississippi County being reclassified as 'nonattainment'" (*id.* ¶ 64), leading to

additional regulatory burdens for Nucor (*see id.* ¶¶ 65–68). Sixth and finally, Nucor

alleges that emissions from the Big River Steel facility will partially or completely

---

[11] For simplicity's sake, the Court refers to the Second Supplemental and Amended Complaint as "the complaint" throughout this opinion.

consume the regional PSD increments for PM$_{2.5}$ and PM$_{10}$, constraining any future Nucor construction project that generates particulate matter emissions and that requires PSD review.  (*See id.* ¶¶ 63, 72–81.)

With respect to the contention that the Big River Steel mill will consume some or all of the pertinent PSD increment, Nucor alleges, first of all, that it is "nearly certain" that its two mills in Arkansas will undergo PSD review in connection with future modification projects.  (*Id.* ¶ 78.)  Furthermore, in support of this prediction, Nucor alleges that both of its mills have previously been subject to PSD review (*see id.* ¶¶ 4–5); that one of its two mills "is currently pursuing permit modifications that may require PSD review" (*id.* ¶ 78); and that over the past 25–30 years, its two mills have averaged almost an ADEQ-air-permit modification per year apiece, "[m]any" of which required PSD review (*id.*).  Nucor also alleges that any PSD permit applications that it might seek in the future will be meaningfully constrained by Big River Steel's emissions (*see id.* ¶¶ 78, 80–81), because Big River Steel's new facility is located just 20 miles upwind of Nucor's mills (*see id.* ¶¶ 10–11) and is in the same air quality control region as Nucor's mills (*see id.* ¶ 8), and Nucor maintains that Big River Steel's new mill will emit particulate matter that "will reach the Nucor mills" (*id.* ¶ 27) and "impact the overall air quality in Mississippi County" (*id.* ¶ 28).

In its pending motion to dismiss, the EPA argues that Nucor lacks standing to sue because none of its asserted injuries amounts to an "injury-in-fact" that is cognizable under Article III of the Constitution.  (*See generally* Mot.)  The agency makes compelling arguments that Nucor's assertions of injury related to its employees and property rely on speculation about increased risk of harm and fail to account for

Nucor's own emissions (*see id.* at 11–14), and that Nucor's assertions of competitive injury, injury related to BACT standards, and injury arising from an exceedance of the NAAQS all rely on speculation about the unpredictable future conduct of third-party regulators (*see id.* at 14–17).

As for Nucor's PSD-increment theory of standing, the EPA maintains that Nucor's complaint contains insufficient allegations of fact to support a finding of standing insofar as it fails to allege adequately that Nucor will imminently need to secure a PSD permit or that any such permit would likely be more restrictive as a result of emissions from the Big River Steel facility.  (*See id.* at 18–23.)  Nucor responds that its complaint references a permit modification that one of its Arkansas facilities is currently pursuing, and thus Big River Steel's consumption of the PSD increment affects Nucor's *present* behavior.  (*See* Nucor's Req. for Oral Arg. & Opp'n to EPA's Mot. to Dismiss Second Suppl. & Am. Compl. for Lack of Jurisdiction ("Opp'n"), ECF No. 47, at 37.)  Nucor also argues that even if those present effects are insufficient to confer standing, Nucor has adequately alleged that it will need PSD permits in the future and that those permits will be impacted by Big River Steel's emissions.  (*Id.* at 37–39.)

The EPA's motion to dismiss Nucor's complaint for lack of standing is now ripe for decision (*see* Mot.; Opp'n; EPA's Reply in Supp. of Mot. to Dismiss Second Suppl. & Am. Compl. for Lack of Jurisdiction ("Reply"), ECF No. 50); this Court held a hearing on the motion on May 17, 2016.[12]

---

[12] Big River Steel has attempted to participate in this lawsuit in several respects.  It has sought leave to intervene (ECF No. 9), which the Court denied (Order, ECF No. 34); leave to file briefs in support of EPA as an *amicus curiae* (ECF Nos. 23, 29, 45), which the Court granted (Order, ECF No. 34; Min. Order of Nov. 18, 2015); and leave to participate in the Court's two Motion Hearings (ECF Nos. 36,

## II.    LEGAL STANDARDS

### A. Motions To Dismiss For Lack of Standing Under Rule 12(b)(1)

Article III of the Constitution limits the judicial power of the federal courts to "[c]ases" and "[c]ontroversies[,]" U.S. Const. art. III, § 2, and that limitation creates a jurisdictional requirement that the plaintiff have standing to sue. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Because it is a plaintiff's burden to demonstrate that the court has jurisdiction over his claims, "[e]very plaintiff in federal court bears the burden of establishing the three elements that make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability." *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012) (quoting *Defs. of Wildlife*, 504 U.S. at 560–61). Thus, to establish standing in a lawsuit that seeks an injunction, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation omitted).

Courts consider motions to dismiss a complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1). *See, e.g.*, *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 48 (D.C. Cir. 2016). In evaluating whether the plaintiff has established the three elements of standing, the Court must be mindful of the stage of the litigation, because "each element must be supported in the same way as any other matter on which

---

55), which the Court denied (Min. Order of Jan. 6, 2015; Min. Order of Feb. 29, 2016).

the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence

required at the successive stages of the litigation." *Defs. of Wildlife*, 504 U.S. at 561;

*accord Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912–13 (D.C. Cir. 2015).

Thus, at the pleading stage, "a complaint must state a *plausible* claim" that the elements

of standing are satisfied, *Humane Soc'y of U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir.

2015) (emphasis added) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), and when

deciding whether the plaintiff's assertion of standing is plausible, "the court must

accept as true all of the factual allegations in the complaint and draw all reasonable

inferences in favor of the plaintiff, but the court need not 'accept inferences

unsupported by the facts or legal conclusions that are cast as factual allegations.'" *Cal.*

*Clinical Lab. Ass'n v. Sec. of Health & Human Servs.*, 104 F. Supp. 3d 66, 74 (D.D.C.

2015) (quoting *Rann v. Chao*, 154 F. Supp. 2d 61, 63 (D.D.C. 2001)).  Finally, while

reviewing a motion to dismiss pursuant to Rule 12(b)(1), the Court may consider

material outside of the pleadings as it deems appropriate.  *Am. Freedom Law Ctr.*, 821

F.3d at 49.

### B.   When The Plaintiff Alleges A Procedural Violation, Some Standing Requirements Are Relaxed But Others Are Not

Often, a plaintiff who is injured by a government action (or its failure to act)

sues to rectify the government's violation of a procedural requirement that is connected

to the substantive action.  In such a lawsuit, a plaintiff "who has been accorded a

procedural right to protect his concrete interests can assert that right without meeting

all the normal standards for redressability and immediacy." *Defs. of Wildlife*, 504 U.S.

at 572 n.7.  This principle means that the plaintiff need not demonstrate that correcting

the procedural violation itself would necessarily remedy the injurious government

action, so long as "there is some possibility" that it would do so.  *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).  Thus, for example, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Defs. of Wildlife*, 504 U.S. at 572 n.7.

Be that as it may, alleging a procedural violation does not excuse a plaintiff from having to identify a related, substantive government action that actually does (or imminently will) cause him concrete injury in order to establish standing to sue.  Put another way, "the requirement of injury in fact is a hard floor of Article III jurisdiction[,]" and courts have long held that "a procedural right *in vacuo* . . . is insufficient to create Article III standing."  *Earth Island Inst.*, 555 U.S. at 496, 497.

Thus, returning to the dam example: the *adjacent* property owner has standing to demand an environmental impact statement, notwithstanding the small chance that the statement will change the government's decision to license the dam, and without regard to the fact that construction of the dam is years away (i.e., not imminent).  However, "persons who live (and propose to live) at the other end of the country from the dam" would not have standing to file suit to enforce the impact-statement requirement.  *Defs. of Wildlife*, 504 U.S. at 572 n.7.  This is because the law permits a somewhat attenuated connection between the allegedly botched procedure and the underlying injurious substantive action, but there must always be a causal link between the underlying substantive action and the plaintiff's injury.  *See WildEarth Guardians v. Jewell*, 738

F.3d 298, 306 (D.C. Cir. 2013); *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15 (D.C. Cir. 2011) (noting that the injurious action must be one "that would otherwise confer Article III standing" if challenged directly (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 918 (D.C. Cir. 1989))).  Thus, even a plaintiff whose procedural rights have been violated cannot establish standing "[w]ithout an imminent threat of injury traceable to the challenged action[.]"  *Nat'l Ass'n of Homebuilders*, 667 F.3d at 15.

## III.   ANALYSIS

In its motion to dismiss, the EPA argues that Nucor has failed to establish that it will suffer an injury-in-fact as a result of the agency's failure to respond to Nucor's petition, because Nucor has not demonstrated that it will be harmed by the underlying substantive decision at issue (i.e., the EPA's failure to object to the permit that ADEQ issued to Big River Steel).  (*See* Mot. at 10–23.)  As noted, the agency has dutifully attacked each of the myriad bases upon which Nucor claims that the emissions from Big River Steel's new plant will injure it.  (*See, e.g.*, *id.* at 13 (arguing that Nucor cannot claim that it is injured by damage that Big River Steel's emissions will cause to its property because the "emissions from Nucor's own mills exceed the permitted emissions from Big River").)  Nevertheless, as explained below, this Court concludes that Nucor *has* asserted a concrete and particularized injury resulting from ADEQ's approval of Big River Steel's new mill, insofar as Nucor plausibly contends that its current plans to modify its own existing plants are likely to require PSD review yet Big River Steel's new facility will consume all or most of the applicable PSD increment.  This Court also finds that correcting the EPA's alleged procedural violation would

create the requisite possibility of redress for this PSD-increment injury, and as a result, Nucor's complaint adequately alleges that Nucor has standing to sue.

### A.      Nucor Has Adequately Alleged An Injury-In-Fact

For the following reasons, this Court concludes that Nucor's alleged PSD-increment injury is "concrete and particularized[,]" and is also "actual or imminent, not conjectural or hypothetical." *Defs. of Wildlife*, 504 U.S. at 560 (internal quotation marks and citations omitted).

### 1.      Consumption Of The PSD Increment Is A Concrete, Particularized Injury

As explained above, when a major emitting facility seeks permission to embark on a construction project that requires PSD review, it must demonstrate that its emissions will not "cause or contribute to" an exceedance of any applicable PSD increment.  42 U.S.C. § 7475(a)(3).  If other nearby facilities have already emitted significant amounts of a pollutant, those prior emissions consume the corresponding PSD increment, leaving less behind for a proposed construction project to consume. *See* 40 C.F.R. § 52.21(b)(13)(ii) (providing that emissions from other sources "affect the applicable maximum allowable increase[]" that a new facility must take into account when applying for a PSD permit); *see also* NSRWM at C.26, 34–35 (explaining that a facility must account for other increment-affecting sources within the area in which it will have a significant impact).  Under this regulatory regime, the mechanics of which the EPA has laid out in a document called "The New Source Review Workshop Manual," if one facility is allowed to emit a given pollutant in a given region, its action meaningfully constrains many of the future construction projects of its pollution-

emitting neighbors.   *See* NSRWM at C.34–35.[13]   Thus, it is clear to this Court that consumption of the PSD increment is a concrete and particularized harm that qualifies as an injury-in-fact for the purpose of Article III standing.

First of all, there can be little doubt that PSD-increment injury is a concrete harm.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) ("A 'concrete' injury must be '*de facto*'; that is, it must actually exist.").  The Supreme Court has recognized a variety of "concrete" injuries, ranging from the tangible, *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000) (loss of money); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012 & n.3 (1992) (loss of real property), to the intangible, *see Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) (informational harm); *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) (aesthetic harm).  Ultimately, the word "concrete" is "meant to convey the usual meaning of the term—'real,' and not 'abstract.'"  *Spokeo, Inc.*, 136 S. Ct. at 1548 (citations omitted).  A government action that restricts a plaintiff's ability to emit pollution—and thus limits its ability to operate a manufacturing facility as it chooses—doubtless inflicts a concrete injury on that plaintiff.  *See UARG*, 134 S. Ct. at 2445.  Accordingly, when a permit enables a polluter to consume all or part of the PSD increment such that a

---

[13] The Environmental Appeals Board, an administrative tribunal within the EPA, has described the New Source Review Workshop Manual as follows:

> The New Source Review Workshop Manual is a draft document issued by EPA's Air Quality Management Division in October 1990.  It was developed for use in conjunction with new source review workshops and training, and to guide permitting officials.  Although it is not accorded the same weight as a binding Agency regulation, it has been looked to by this Board as a statement of the Agency's thinking on certain PSD issues.

*In re: Commonwealth Chesapeake Corp.*, 6 E.A.D. 764, *3 n.6 (EAB 1997).  The Supreme Court has relied on the Manual for insight into how the EPA implements the PSD program.  *See Alaska Dep't of Envtl. Conservation*, 540 U.S. at 476, 497; *see also UARG*, 134 S. Ct. at 2457 & n.1 (Alito, J., concurring in part and dissenting in part).

neighboring permit applicant must promise reduced emissions in order to comply with the PSD program, the neighboring applicant suffers a concrete injury.

Second, Nucor's alleged PSD-increment injury is sufficiently particularized. The particularity requirement bars lawsuits that "rais[e] only a generally available grievance[,]" because a plaintiff is "seeking relief that no more directly and tangibly benefits him than it does the public at large[.]" *Defs. of Wildlife*, 504 U.S. at 573–74. A lawsuit to redress PSD-increment injury does not raise a mere generalized grievance: the PSD increment is a scarce resource within a confined geographical area, and its scarcity constrains only prospective polluters within that region. *See* 42 U.S.C. § 7475(a)(3)(A) (providing that a PSD-permit applicant must demonstrate that its emissions will not cause or contribute to an exceedance of the PSD increment "in any area" governed by the PSD program). When one facility's consumption of a PSD increment subjects its neighbor's imminent construction plans to more stringent emissions limitations under the PSD program, the neighbor is "affect[ed] . . . in a personal and individual way[,]" and its injury is therefore particularized. *Defs. of Wildlife*, 504 U.S. at 560 n.1; *cf. La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (explaining that when a government action benefitting one entity increases competitive pressures on another entity within the same market, the second entity can establish an injury-in-fact under a competitor-standing theory).

Moreover, as explained at the outset, the EPA ultimately does not dispute that a PSD-increment injury—when plausibly alleged by a pollution emitter with genuinely imminent construction plans that will be constrained by a neighbor's emissions—constitutes a concrete and particularized injury that is cognizable under Article III.

(*See* Mot. at 19 n.9 (describing allegations Nucor would need to make "[t]o show injury based on an alleged overconsumption of the increment").)  Instead, the EPA argues that, given the circumstances presented in Nucor's complaint, Nucor has not adequately alleged that such an injury is *imminent*.  (*See* Mot. at 18–23.)  This Court disagrees, for the reasons explained below.

2. <u>Nucor Has Adequately Alleged That The Asserted PSD-Increment Injury Is Imminent</u>

In its complaint, Nucor specifically alleges that, due to ADEQ's decision to grant the Big River Steel permit, when Nucor undertakes to "evaluat[e] whether a future modification" to one of its facilities "will contribute to an exceedance of the NAAQS or an exceedance of the PSD increment," Nucor "will have to take the additional BRS emissions into account . . . , which will constrain [Nucor]'s ability to obtain permit modifications without additional pollution controls or operating restrictions."  (Compl. ¶ 81.)  The EPA's primary response to Nucor's PSD-increment theory of injury is that Nucor has not plausibly alleged that it is *in fact* "planning modifications [to its mills] that would require a PSD permit" (Mot. at 18), or that there is an "overlap between the geographic areas affected by Nucor's emissions and the emissions from the Big River facility" such that Big River Steel's emissions would "affect the amount of increment available to Nucor" (*id.* at 20).  According to the EPA, these two inadequacies render the allegations in Nucor's complaint "insufficient to establish that the permitting of emissions from Big River causes an actual or imminent injury to Nucor."  (*Id.* at 18.)  But the EPA's contention disregards the pleading standards applicable at this early stage of the litigation, which require only that Nucor *plausibly* allege that the asserted PSD-increment injury is imminent.

Specifically, where, as here, a plaintiff's assertion of injury depends on the plaintiff's own future plans, courts examine whether the injury is imminent from two angles: the firmness of the plaintiff's future plans, and the likelihood that the challenged government action will implicate those plans. *See, e.g.*, *In re Navy Chaplaincy*, 697 F.3d 1171, 1176 (D.C. Cir. 2012); *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 83 (D.C. Cir. 2012). For example, in *In re Navy Chaplaincy*, a group of military chaplains alleged future injury in the form of religious discrimination by selection boards that would consider their future candidacies for promotion. 697 F.3d at 1175–76. The D.C. Circuit assessed that "assertion of future injury" by dividing the contention into "two subsidiary premises: that plaintiffs will be considered for promotion by future selection boards and that selection boards will discriminate against them." *Id.* at 1176. The court proceeded similarly in *NB ex rel. Peacock*. *See* 682 F.3d at 83. That is, in order to evaluate whether the plaintiff had adequately alleged future denial of Medicaid prescription coverage without the requisite notice, the court subdivided its analysis into the "contingencies" of (1) "whether [the plaintiff] ha[d] alleged an ongoing need for prescription coverage[,]" and (2) whether the defendant agency was "likely to . . . den[y] coverage . . . [and] fail to provide the required notice upon denial." *Id.* And these twin inquiries regarding (1) the plaintiff's future plans, and (2) the likelihood that the challenged government action will implicate those plans, are parallel perspectives from which to examine the ultimate issue: whether, in light of the plaintiff's allegations, it is plausible that the alleged injury is imminent. *See id.* at 85–86.

With respect to Nucor's future plans, this court finds that Nucor has adequately alleged that its future construction projects will require a PSD permit.  Nucor asserts that it is "nearly certain" that its two mills in Arkansas will undergo PSD review in connection with future modification projects.  (Compl. ¶ 78.)  Furthermore, in support of this prediction, Nucor alleges that both of its mills have previously been subject to PSD review (Compl. ¶¶ 4–5); that one of its two mills "is currently pursuing permit modifications that may require PSD review" (Compl. ¶ 78); and that over the past 25–30 years, its two mills have averaged almost one ADEQ-air-permit modification per year apiece, "[m]any" of which required PSD review (*id.*).  At this early stage of the litigation, these allegations suffice to support a plausible inference that Nucor will soon embark on a construction project that requires a PSD permit.  *See, e.g.*, *Peacock*, 682 F.3d at 83 (concluding that a plaintiff who had alleged that he needs two inhalers per month "is virtually certain" to engage in the conduct in the future that would subject him to injury); *Dearth v. Holder*, 641 F.3d 499, 502–03 (D.C. Cir. 2011) (holding that plaintiff's "stated intent to return regularly to the United States" and purchase firearms made the injury that he would suffer in those circumstances "sufficiently real and immediate to support his standing" at the pleading stage); *Emergency Coalition to Defend Educational Travel v. U.S. Dep't of Treasury*, 545 F.3d 4, 10 (D.C. Cir. 2008) (holding that the plaintiff had made adequate assertions regarding his future plans to lead a study-abroad program, where he described "the consistent annual repetition of the . . . program over several years" and his "concrete plans for the content and focus of the [upcoming year's] program").

The EPA's argument regarding Nucor's future intentions fails to appreciate the lower standard that is applicable at this phase of the litigation. (*See* Mot. at 18–19.) Citing the Supreme Court's admonition in *Defenders of Wildlife* that "'some day' intentions . . . do not support a finding of . . . 'actual or imminent' injury," the EPA contends that Nucor's "allegations are too vague and speculative" to establish that it has imminent construction plans that will require PSD review. (Mot. at 19 (quoting *Defs. of Wildlife*, 504 U.S. at 564).) But *Defenders of Wildlife* was clear that its analysis was contingent on the case having arisen *at the summary judgment stage*, 504 U.S. at 561, and indeed the decision's author clarified just weeks later that the standing challenge in *Defenders of Wildlife* "would have been unsuccessful" had it "been made at the pleading stage." *Lucas*, 505 U.S. at 1012 n.3; *see also Food & Water Watch*, 808 F.3d at 912–13.

The EPA's arguments regarding Nucor's future plans are similarly misplaced. For example, the agency argues that Nucor's allegation that it is "currently pursuing permit modifications that may require PSD review" (*see* Compl. ¶ 78) does not pass muster because many Title V permit modifications *do not* require PSD review. (*See* Mot. at 18–19 & nn.8–9 (emphasizing that PSD review is not required for changes that do not amount to "major modifications")); *see also* 40 C.F.R. § 51.166(a)(7)(i), (b)(2)(i); *Envt'l Def. v. Duke Energy Corp.*, 549 U.S. 561, 568–69 (2007). Moreover, the EPA continues, even those permit modifications that *do* require PSD review only entail PSD-increment analysis if the modification increases emissions of a pollutant by a "significant" amount. (Mot. at 18 n.8 (citing 40 C.F.R. § 51.166(b)(23), (m)(1)(i)).) But these criticisms simply identify the sorts of "'specific facts that are necessary to

*support* the [complaint's] claim'" of injury, *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063–

64 (D.C. Cir. 2015) (emphasis added) (quoting *Defs. of Wildlife*, 504 U.S. at 561), and

at the motion-to-dismiss stage, the court must "'presum[e] that [the plaintiff's] general

allegations embrace'" such facts. *Id.* (citation omitted). Consequently, Nucor's failure

to include in the complaint detailed allegations regarding the extent to which the

planned permit modifications will actually and ultimately require PSD review does not

undermine the plausibility of an inference that it has imminent construction plans that

will require such review.

As for the likelihood that Nucor's future PSD permits will be subject to more

stringent limitations as a result of Big River Steel's emissions, Nucor has again alleged

enough facts to move forward. In support of the complaint's contention that Nucor's

future PSD permit applications will be meaningfully constrained by Big River Steel's

emissions (*see* Compl. ¶¶ 78, 80–81), the complaint alleges that Big River Steel's new

facility is located just 20 miles upwind of Nucor's mills (*see id.* ¶¶ 10–11), is in the

same air quality control region as Nucor's mills (*see id.* ¶ 8), and will emit particulate

matter that "will reach the Nucor mills" (*id.* ¶ 27) and will "impact the overall air

quality in Mississippi County" (*id.* ¶ 28). Given these allegations (which the Court

must accept as true), it is certainly plausible that Nucor's future PSD permit

applications will have to account for Big River Steel's particulate matter emissions and

that, as a result, Nucor will have to promise correspondingly lower new emissions in its

future PSD permit applications.

The EPA challenges Nucor's allegations by pointing out that the operation of

PSD-increment analysis described above means that "[t]here can be no injury to

Nucor's ability to obtain permits without an *actual* overlap between the geographic areas affected by Nucor's emissions and the emissions from the Big River facility—and Nucor has made no allegations regarding such an overlap." (Mot. at 20 (emphasis added).) The agency adds that Nucor's contentions about the geographical proximity between the facilities do not suffice to demonstrate actual overlap, because the "significant impact area" that would be used to determine restrictions on any future Nucor PSD permit is identified using complex air modeling that Nucor has not yet performed. (*Id.* at 21–22.)

These arguments both overcomplicate the mechanics of the PSD-increment analysis and underestimate the importance of the litigation stage to a proper evaluation of a plaintiff's injury assertions. As explained above, the "significant impact area" that Nucor will need to analyze in the context of any future PSD-permit application is a circular area that is centered on the relevant Nucor mill, *see* NSRWM at C.26, and Nucor's analysis will need to account for "all increment-affecting sources located within 50 kilometers of the impact area[,]" *id.* at C.35. Nucor's allegations support inferences both that the distance between its mills and Big River Steel's mill is less than 50 kilometers (*see* Compl. ¶ 10), and that Big River Steel's mill is "increment-affecting" (*see* Compl. ¶ 79). What is more, Nucor also specifically alleges that Big River Steel's emissions "will reach the Nucor mills[.]" (Compl. ¶ 27.); *see also Catawba Cty.*, 571 F.3d at 26 ("$PM_{2.5}$ can travel hundreds or thousands of miles.")[14]

---

[14] In this regard, the EPA points out that Nucor's mills are not accessible to the public, which, says the agency, means that Nucor's mills are not considered part of the "significant impact area" in any PSD increment analysis per the applicable regulations. (Mot. at 22 (citing 40 C.F.R. § 50.1(e) (defining "ambient air" for the purpose of the PSD program as "that portion of the atmosphere, external to buildings, to which the general public has access")).) This argument is too clever by half, because it ignores the fact that the complaint's allegation that Big River Steel's emissions "will reach the Nucor

Thus, it is entirely plausible that Big River Steel's emissions will reach the "significant impact area" that Nucor will need to analyze for one of its future construction projects, such that Nucor's future PSD permits will be made more restrictive in light of Big River Steel's emissions.  As a result, this Court concludes that Nucor has adequately alleged for the purpose of the motion-to-dismiss stage that it faces imminent PSD-increment injury.  *See Peacock*, 682 F.3d at 83–84; *see also Food & Water Watch*, 808 F.3d at 912–13 (explaining the lower bar for demonstrating standing that is applicable at the pleading stage).[15]

> **B.      Nucor Has Adequately Alleged That Its Injury Is Fairly Traceable To The EPA's Conduct And Would Likely Be Redressed By A Favorable Outcome In This Lawsuit**

Finally, although the EPA does not dispute the causation and redressability aspects of Nucor's purported standing, this Court will evaluate those standing elements, because the Court has "an independent obligation to assure [itself] that jurisdiction is proper."  *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008).

---

mills" (Compl. ¶ 27) gives rise to the logical inference that Big River Steel's emissions will also reach the publicly accessible land adjacent to those mills that *is* within the "significant impact area."

[15] Because this Court concludes that Nucor has adequately alleged an imminent PSD-increment injury, it need not (and will not) address Nucor's alternative argument that it is *already* suffering a PSD-increment injury by virtue of the changes to its construction plans that it must make *now* in anticipation of future PSD-permit applications.  (*See* Opp'n at 36–37.)  It is doubtful that an anticipatory, self-inflicted injury confers standing unless the plaintiff undertakes the injurious act in anticipation of a certainly impending, externally-inflicted injury that would confer standing in its own right.  *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1151 (2013) ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.").  This Court has already opined about the heart of the instant impending-injury matter by concluding that Nucor's alleged future PSD-increment injury is imminent.  Thus, this Court sees no need to evaluate whether the plan change that Nucor is allegedly making at present in anticipation of the imminent PSD-increment injury confers standing in-and-of-itself.

With respect to causation, there can be little doubt that Nucor's PSD-increment injury is fairly traceable to the EPA's failure to object to Big River Steel's permit.  That is, if the EPA had objected, ADEQ would have been forbidden from issuing a Title V permit to Big River Steel, and Big River Steel could not construct or operate its mill.  *See* 42 U.S.C. § 7661d(b)(3).  It is likewise clear that the EPA's failure to object is connected to the alleged procedural failing that Nucor challenges in this lawsuit, which is the agency's failure to respond to Nucor's petition for an objection.  *See WildEarth Guardians*, 738 F.3d at 306 (explaining that, to demonstrate causation in the procedural-injury context, "[a]ll that is necessary is to show that the procedural step was connected to the substantive result" (quoting *Massachusetts*, 549 U.S. at 518)).  In other words, if the EPA had reviewed and responded to Nucor's petition in a timely fashion, it would also have had to object to Big River Steel's permit in the event that it determined that Nucor "demonstrate[d] . . . that the permit is not in compliance with the [CAA.]"  42 U.S.C. § 7661d(b)(2).  Therefore, it is undoubtedly the case that the procedural omission is "connected to" the substantive government action that directly causes Nucor's alleged injury.  *See WildEarth Guardians*, 738 F.3d at 306.

Nucor has likewise satisfied the relaxed standard for redressability that applies in cases raising procedural violations.  Just as the landowner adjacent to a proposed dam does not need to demonstrate that requiring an agency to issue a statutorily required environmental impact statement will necessarily alter the substantive decision to build the dam, *see Defs. of Wildlife*, 504 U.S. at 572 n.7, Nucor need not demonstrate that requiring the EPA to respond to its petition will necessarily result in the EPA issuing an objection and blocking Big River Steel's permit.  In the procedural-injury context, it

suffices that the agency "might" do so, *Lemon v. Green*, 514 F.3d 1312, 1315 (D.C. Cir.

2008), and as just mentioned, that possibility exists here.

Accordingly, in light of the legal standards that apply to the standing

determination when a plaintiff challenges an agency's alleged procedural violation,

Nucor's PSD-increment injury is fairly traceable to the challenged conduct by the EPA

and would likely be redressed by the relief that Nucor seeks.

## IV.    CONCLUSION

Nucor has employed the CAA's procedure for petitioning the EPA to object to a

state-issued Title V permit, and has now filed a complaint in this Court that maintains

that the agency has failed to grant or deny its petition within the required timeframe.

Thus, the immediate subject of Nucor's lawsuit is a mere procedural violation, but

Nucor's stake in the substantive outcome of this litigation is allegedly very real,

because the Title V permit that is the subject of Nucor's petition enables Big River

Steel to operate a new steel mill just twenty miles away from Nucor's two steel-

manufacturing facilities.  There is no dispute that all three plants are in the same county

and in the same air quality control region, and Nucor alleges that it has pending

construction plans at one of its preexisting mills that will require PSD review, and

therefore will be meaningfully constrained by Big River Steel's consumption of the

applicable PSD increment for the region.  For the reasons explained above, this Court

concludes that, at this early stage of the litigation, Nucor has said enough to allege a

concrete and particularized injury that is fairly traceable to the EPA's failure to timely

respond to Nucor's petition, and that Nucor's complaint contains sufficient facts to

support a plausible claim that the injury Nucor faces (in the form of Big River Steel's

consumption of the PSD-increment) is imminent and would likely be redressed by a favorable outcome.

Accordingly, the allegations of Nucor's complaint sufficiently support Nucor's contention that it has standing to pursue the relief that it seeks in this lawsuit, which means that, as set forth in the accompanying order, the EPA's motion to dismiss for lack of standing must be **DENIED**.


DATE:  March 31, 2017                    *Ketanji Brown Jackson*
                                         KETANJI BROWN JACKSON
                                         United States District Judge